I hope this is not too much, I'm sorry. All right. So Mr. Spurd, am I pronouncing that right? Yes, Your Honor. All right. Mr. Spurd, you have reserved two minutes for rebuttal, so that gives you eight minutes to begin. Well, actually, let's let these other folks get seated. Thank you, Your Honors. If it may please the Court, my name is Peter Spurd. I'm the attorney for plaintiff and the appellant in this case, Dr. Ali Mohamed Moussaoui. Dr. Moussaoui is an American citizen of Lebanese descent who invested substantial sums of money in Lebanon. And there's a case pending in Lebanon related to – it's parallel to this case, right? That is true, Your Honor. That is true. BBAC was highly insolvent, and this is according to the publication by Jim Rickards of the Foundation for Defense of Democracies, that at the time, generally in question in this case, a step forth in the pleadings, that BBAC Bank was highly insolvent. It needed $2.2 billion to top up its negative equity and support the balance sheet in accordance with international norms. Mr. Rickards continues in his very thorough analysis of all the banking institutions in Lebanon at this time. He says a silent run on the banks began. Elites were forewarned and transferred large dollar deposits out of Lebanon ahead of capital controls. Incidentally, in this case, Dr. Moussaoui requested one month before the Central Bank of Lebanon issued its central bank financial control to terminate his term deposit and close the fund and get it back to him. A month the bank refused, and a month later, the central bank said there's going to be no more USD withdrawals. Is there an allegation that tells us, because it feels like that distinction is critical for your argument in terms of the distinction you're drawing with the Dow case. And so your position, as I understand it, is that the failure to pay or refusal to pay your client's US dollars did not arise from central authorities' regulation prohibiting expatriation of foreign currency. It arose from the insolvency of the bank? Dow is a breach of contract case. And a lot of the progeny on these Lebanese bank cases are breach of contracts. I asked you to return the money for me from Lebanon. You refused to do it. Breach of contract. This case, this approach to this case, which is a hard nut to crack. But what we have here is akin to a Ponzi scheme. And ultimately, it is the debtor-creditor law theory of an insolvent actor, a foreign bank using an identified account of US dollars to render itself, while insolvent, to deplete itself of US dollars to the detriment of who Jim Rickards calls the sucker, which is the individuals who lost money by depositing money who are Lebanese descendants of the diaspora. But under your view, everybody who deposited money in the bank in Lebanon has a cause of action here, right? To the extent of the, well, it's temporal. We have a time limit where we made our demand. But ultimately, anybody, any of the street investor who put US dollars into the Lebanese, into BBAC, whose money was secreted and put away, paid to insiders, were paid while insolvent, while my client had a term deposit account, which I think is one subtle distinction, Your Honor, which I think is important to note. I believe the general proposition is if I put general funds into a checking or savings account, that assets becomes the property of the bank. However, if I have a term deposit, a separate contract, that money remains the title of the depositor. So there's that distinction, Your Honor. And is that how you can allege that the money that was sent to the correspondent banks in New York for distribution to the insiders was your client's money? Yes, especially in the world of a finite resource of US dollars, given the insolvency of these banks. And does that depend on the fraudulent conveyance theory under Lebanese law that you've alleged in the complaint? Well, from my understanding, and this was briefed below, that there is no fraudulent conveyance law in Lebanon. There's a criminal statute of which Dr. Moussaoui, the sucker on the street, is not a prosecutor, he's not the state, he's just a sucker investor who got ponzi'd out of his $4 million, roughly. I digressed, I'm sorry. No, no, so that's helpful. So the discussion in your complaint about Lebanese law as it relates to debtor-creditor fraudulent conveyances is not the backbone of your legal theory. Are you bringing the theory under US law? Yes, New York law. How do you get to New York law in this banking relationship? Well, the banks are funneled underneath wires, underneath this building, wired money back and forth to the bank. But as a matter of choice of law, I'm just trying to figure out how that is. For the choice of law, I believe that when there is no conflicting law between Lebanon versus New York, then the New York law is going to govern. The choice of the venue. I thought you just said there wasn't any. There's no fraudulent conveyance law in Lebanon. Correct, there's a criminal statute that if you make yourself insolvent, there's a criminal penalty for that. But so the absence of a law in Lebanon makes it legal here to defraud investors using New York banks. But the defraud, I mean, look, in Lebanon they could have just said, hey, we're not giving you your money. You're saying that because they wired, generally wired money to accounts in New York, that makes New York the locus of the fraud? That makes New York a vehicle, a conduit, a very key element to effectuate. Fine, but they could have just said, we're not going to give you your money. It's here, but we're not going to give it to you. Would that have made a difference to your client? That would make it a difference to my client because the artifice of the fraudulent conveyances to insiders and other people in U.S. dollars necessarily has to come through New York as per their choice of using it. So are you applying the same standard for choice of law that we would apply for personal jurisdiction in terms of the significance of the conveyances through New York? I believe that's what I'm doing. I believe that's what Dr. Massawi is doing. Is the standard the same? That I don't know. But why is this any different than Dow then? Because, I mean, it seems to me really your theory doesn't really turn on whether this is a fraudulent conveyance. It turns on whether or not the money was sent to U.S. accounts. But that is, that might be one quarter or a third of the pleadings at bar. But that then discounts and gets rid of the separate fraudulent conveyances that are made by an illiquid institution by using U.S. dollars to pay its insiders and other preferential owners through the New York. So it's easy to put this case in the Dow box. And that's what a lot of the progeny cases are saying. Oh, this is a breach of contract case. Of course it's a breach of contract case. You ask them to send you the money, they didn't do it. Well, okay, fine. But we are not arguing breach of contract. The Second Circuit, this Court has already held that a breach of contract case of this nature is necessarily not going to hold. But the debtor- Fraudulent conveyance means that you've taken somebody's property and you've given it to somebody else, not for consideration, right? Yes, or- The corresponding bank account is not that. I'm sorry? I said a wire transfer to a U.S. correspondent bank account is not that, is it? What's your best case for fraudulent conveyance of just a wire transfer to a New York bank? It's the artifice of the using of New York banks to take your limited, finite U.S. dollars when you're insolvent and sending it out to other, to make preferential transfers other than to Dr. Massawi, who has a legitimate and valid claim to his U.S. dollars and rendering yourself insolvent. But they're not. That's the whole point. They're fungible dollars. They're not his U.S. dollars. It's not like a ring. Well, on one hand, yes, dollars and lira are fungible. However, if you have a separate segregated account of your investment, your term investment, and the bank takes that money and renders itself insolvent by giving it to someone else through the use of- Well, if they take that money and give it to somebody who wants to open a store, that's what they do. They take deposits and then they lend them to other people. You would be suggesting that's a fraudulent conveyance too, I think. No, I think if it rendered the bank insolvent. But you also have to look at the backdrop of New York banks, or banks in general in this country anyway, are generally publicly audited. They give financial statements, and there's a transparency. BBAC basically stopped doing financial statements, let alone publicly audited by KPMG and others in or around 2019, 2020, 2021. So all of a sudden, what may have seemed to be a very transparent process turned into a very opaque process, and that's because the Ponzi scheme was starting to unroll. Dr. Moussaoui has basically no value left in his USD, in his was brought to attach USD here to ensure that when the dust settled, he would have his claim to his $3.8 million. But also to say, hey, you guys are running a Ponzi scheme through the banks of New York. And how can the rights of Dr. Moussaoui, an American citizen, be trumped by the opacity of a foreign entity that's using New York banks under our feet to defraud and Ponzi and run away by giving U.S. dollars to its insiders? Can I go back to... I didn't want to interrupt you, Phil, but I'm sort of reeling from the conversation we had before about New York debtor-creditor law, because I'm looking now at count two of your complaint. And it describes Lebanese law article 691, which may be applicable to the case at bar. And it talks about when you... The contract is deemed as a loan once the... Essentially saying once your term ended, it's as if your money was being loaned to the bank. And therefore you have a debtor-credit relationship under Lebanese law. Under Lebanese law, fraudulent transfer applies in general to payments. Then you talk about the Lebanese penal code. Then you say Lebanese law provides a civil remedy for a violation of penal code violations. I'm confused, because I see nothing in here that suggests you're making a New York law claim, but you're now arguing that you're not making a Lebanese law claim. You're making a New York law claim. Your Honor, I think the problem is that we never... There were arguments on both sides, but we never got a decision from the trial court about whether what law was going to apply at all. We only got from the trial court, hey, you know, this is a contract case and you don't have standing to even be here. And then on top of that, there's this forum nonconvenience argument that we may or may not... I understand that, but you just told me that you were making claims under New York law, and that seems directly at odds with your... Forget about what was or wasn't decided. Tell me now that I've looked at the complaint. Are you making claims under Lebanese law, or are you making claims under New York law? Your Honor, we had to make... We made a lot of allegations that were plausible in the complaint. I think that if we were to look at each single instance, because we have a general agreement with the bank in Lebanon that we're looking at, we're looking at a passport, a passbook for the terms therein. Sounds like the answer is it's complicated. It sounds like it's complicated. I don't know exactly where we're going to land. But what I do know is that to dismiss this case with prejudice will foreclose Dr. Moussaoui from finding a remedy basically anywhere. Well, I'm going to certainly ask your colleague on the other side about it with prejudice. So maybe we'll pick up there, and you have a couple of minutes for rebuttal. That's fine. Thank you. Ms. Sheifetz or Heifetz? How do you pronounce it? Yes, Your Honor, Ms. Heifetz. Heifetz, that's what I thought. So, Ms. Heifetz, I wanted maybe you to start with prejudice. I mean, generally dismissal for lack of personal jurisdiction is without prejudice. It doesn't bar the plaintiff from bringing a claim in a different jurisdiction where there is personal jurisdiction, right? That's right, Your Honor, and I think this court has addressed this in different ways in different cases, and certainly the court can simply note in its decision that it thinks it should be a dismissal without prejudice. So you're conceding that was error? I think that this court has certainly regarded that as error in other instances, and that's not a point of contention here that we are looking to press. The real issue here is that the case does need to be dismissed, just as Judge Ramos did, and just as other judges in the Southern District of New York and in the New York State courts have done in very similar cases. This isn't just about Dow, where obviously this court affirmed the determination that there was a lack of personal jurisdiction, but also the more recent, for example, Char case that we cite in our brief, which was a decision of the New York Appellate Division, the First Department. And in the Char case, there were, as here, allegations about fraudulent conveyances to bank insiders. Much like here, and here I think it's an even more egregious example, we have just this really conclusory allegation that there are transfers to insiders, full stop. One of a kind of classic instance of the legal conclusion being couched as a factual allegation. What we don't have are more specifics that aren't directly contradicted by material before the court that was before Judge Ramos. There's a couple allegations in the complaint about BBAC using its correspondent bank accounts to transfer assets to SF, that seems like a factual allegation. Right, so let's take that exactly where I was going, Your Honor. So those allegations, for example, are about dividend payments. They're drawn from, the allegations pull directly from, public financial statements by BBAC that speak to dividend payments that were approved by the General Assembly and paid to SF in Lebanese pounds in 2019 before the relevant time period. And SF Holdings is a Lebanese company. And so those payments between a Lebanese bank and a Lebanese company, they were done in Lebanese pounds. They did not touch a correspondent account. And that too is reflected in the declarations that the bank and that SF Holdings have put forward. That last part is different from what the allegations in the complaint say. I thought the allegations are that they were through the correspondent bank accounts in New York. Well, the allegation in the complaint says a number of things that don't make very much sense. It seems to be animated by a misconception of how correspondent banking works and how, frankly, banking generally works. So, for example, there is an assertion that SF Holdings What about a motion to dismiss, though, if the allegation is there that it went through the correspondent bank account? Your Honor, the district court, though, quite rightly, did not need to credit a facially implausible allegation. And the suggestion, for example, as we have in the complaint, that SF Holdings has correspondent bank accounts or that SF Holdings is not a bank, or that SF Holdings has access to the funds in BBAC's correspondent bank accounts. These things are not consistent with how correspondent banking works. The correspondent bank account of BBAC is BBAC's account. It does not belong to SF Holdings. And the declarations are not refuted. That sounds like a merits argument to me. I don't think it is, Your Honor, because, again, we are at personal jurisdiction stage, but courts do look beyond the complaint to affidavits where there are facts that are put forward that don't get refuted. And there is nothing here for plaintiffs to point to beyond the assertion that there's been use of a correspondent bank account in ways that can't be reconciled with what the court knows from prior cases just about how correspondent banking works. So, again, SF Holdings is not a bank. It does not have correspondent bank accounts. There is a declaration, again, that does not get disputed, refuted in any way from SF Holdings stating these facts as well. And the complaint, to the extent it offers, any allegation that could possibly be conceived of as having a factual predicate, it is these facts drawn from the bank's public reports from 2019. We're talking about dividend payments. These are not secreting away transactions that are taking money away from. These are. But this is, I think, maybe going back to. So, basically, I'm understanding your position to be that for purposes of the jurisdictional analysis, we're not tied to the allegations in the complaint, and we should disregard those allegations because evidence that defendants have offered says that those allegations are implausible. Is that sort of what you're saying about that? Well, I think there's two things I would say. If you take the allegations on their face, they don't hang together in a way that makes for a basis for personal jurisdiction. So we can take them on their own terms. But we also can take note that as a matter of legal standards, you don't get in personal jurisdiction 12b-2 motions to just rely on conclusory statements that don't have supporting facts. And so here, you can look. The court didn't err in looking at the declarations and materials outside the pleadings. This court, the Supreme Court, has recognized that. And there is an effort here to rely on conclusory statements that, frankly, just aren't plausible. I think the court can recognize that. So I do think you can go beyond what's in the complaint. But let's take what's in the complaint and what the allegations are. I mean, there's a claim, for example, I mean, simultaneously, the gravamon of this complaint is that Mr. Moussaoui's funds in Lebanon, there's no question that he has an account in Lebanon. He's upset that the money is still in the account in Lebanon. He's got a balance there that he wants to withdraw in New York. He acknowledges that he was offered the opportunity to obtain his funds with a check drawn on the central bank of Lebanon, which, of course, could be deposited elsewhere in Lebanon. He rejected that and told the bank, told BBAC, that he demanded a check drawn on the bank of New York, Mellon. And that's not how banking works. You don't get to just – but that's – Let me ask about that, though, because that – I think that ties into what I saw in the briefing, which is this whole fraudulent conveyance theory is a distraction because the reason he's not getting his money is because of the regulations prohibiting expatriation of foreign currency, to which he responds, no, I asked for my money a month and a half before the restrictions on the expatriation of foreign currency, so there must have been some other reason for declining to send me my money. And the fact that your U.S. dollars have been siphoned off through your correspondent accounts in New York has to be that reason. How do you – what do you tell us about that time difference? No, Your Honor, the banking crisis started in 2019. October 2019 is the start of the banking crisis. He's not asking for his money until 2020. Right, but he asks March 11, 2020, and at least he represents that the central – the restriction on transfer of foreign currencies to customers abroad didn't come down until April 21st of 2020. Right. He's identifying a particular circular from the central bank, but the banks of Lebanon, pursuant to guidance from the Association of the Banks of Lebanon, and there's a declaration to this effect as well in the record, had already, because the central bank was already restricting international – the availability of U.S. dollars for international transfers to the banks, the banks had already placed restrictions. And so those restrictions start October 2019. And so there – for example, in the Dow case, the requests for transfers go back to September 2019, and those requests were not satisfied because of the financial crisis. I mean, this is a huge financial crisis that all banks were – commercial banks in Lebanon were responding to in the way that BBAC did. That's why we have all of these cases that involve, you know, a range of Lebanese banks as defendants. It's not a single bank that's involved, and it's not a single point in time. This goes back, again, with Dow. The requests date back earlier than the requests here. And the response from the banks is the same. They are not in a position, because of concerns about preventing the collapse of the economy, they are restricting satisfying requests for international transfers of U.S. dollars. And, look, this is not an uncommon or atypical for places in crisis, whether it's Argentina, Greece, Lebanon. This is – there are steps that banks take, and then there are steps the government takes. But here, that dispute about whether or not it was proper for the bank to reject the transfer request is obviously a merits determination. There is litigation going on in Lebanon around that question brought by – At least the allegation is that that litigation consisted of a complaint and then nothing. So in that case, for example, like there are many litigants litigating in Lebanon, and Mr. Moussaoui is one of them. He has brought a claim against the bank, against Asof, and a number of named individuals. One of the individuals named in the suit was not served. The individual passed away, and there has to be a determination made by Mr. Moussaoui about whether to take that person out of the case or serve their estate. Nothing has happened in terms of that service, and so the case hasn't moved forward. My understanding – that is my understanding – and the impression that I think the lawyers there have is that perhaps Mr. Moussaoui is looking to see how these proceedings pan out first. But the point is that he is one of many, and I think to Judge Sullivan's point, we have already seen many individuals who, as Mr. Moussaoui's counsel noted, we have high net worth individuals who invested in Lebanon before the crisis, left money there, benefited from the relatively high interest rates that were offered, and after the start of the financial crisis are unhappy with how the banks have responded to that crisis and the limitations that have been placed on the international transfer of U.S. dollars. There are ways that Mr. Moussaoui can access his funds in that regard. There's no question that his account in Lebanon remains his account with funds in it. For example, if he were to purchase real estate in Lebanon and make a bank-to-bank transfer, the check that the bank offered that has value in Lebanon can be moved from one Lebanese bank to another. It's that Mr. Moussaoui does not want to do that. He wants to obtain his funds in the United States, and we don't think that he has, as Merit's point to Judge Parkinson, that he has the right to demand that. But as a matter of personal jurisdiction, it really just goes to the fact that this fraudulent conveyance, our claim, as Your Honor notes, is just something that has been constructed to try to evade the holding in doubt. It does not evade the New York State Appellate Court's determination in Char, which involved a very similar and equally amorphous claim about transfers. It also doesn't get around, just to address your point earlier, the fact that there is an agreement here. Though they haven't brought a breach of contract claim, there is an underlying agreement between Mr. Moussaoui and the bank. And at Article 30 of that agreement, there is a choice of law provision that selects Lebanese law. So I think even if this case is to proceed in U.S. courts, which it should not because of the lack of jurisdiction, it is subject to Lebanese law. You know, the arguments about insolvency don't hold water. He relies on a journalist report of years ago. The bank continues to operate, continues to make funds available to individuals in Lebanon, subject to Lebanese regulations and the Lebanese laws that apply. And frankly, if this were a case of insolvency, that would only tell you yet another reason why this should not proceed here. Judge Ramos noted at a very early hearing in this case that this was nothing more than an effort by Mr. Moussaoui to put himself in front of other account holders and others who would have claims on a bank. And the reality is that there are hundreds of thousands of account holders in Lebanon who don't have access to New York courts. They don't have the resources to try to bring claims here. But there are many who would bring claims here if this door is opened. And it's not one that belongs open because the basic facts of how correspondent banking work tell you what you need to know about the allegations here and why they don't support personal jurisdiction. Mr. Moussaoui's claims about Asaf, just to be very clear, again, Asaf is a Lebanese company. So his assertion that there was a transfer, let's take his claim on its face that there was a transfer from BBAC to Asaf. The record reflects the fact that there have only been transfers in Lebanese pounds and that they predate the period and that there's been no transfers in the period. But if we accept his allegation, it still doesn't hold water because a domestic transfer of U.S. dollars wouldn't go through a correspondent bank in the normal course. What would happen is that BBAC, if Asaf had an account at BBAC, it would just be an internal booking. They would just adjust the books and reduce one account and increase another internally. And if Asaf had an account elsewhere in Lebanon, it would go through the central bank. The BBAC's account at the central bank in U.S. dollars would be debited and Asaf's bank's account at the central bank would be credited. It would never pass through a correspondent bank account. There really is a very fundamental way in which this complaint just operates without regard to any kind of the realities of banking. All right. Well, we've gone over, but we'll hear from Mr. Severin for two minutes. Thank you so much, Your Honor. Thank you. Thank you, Your Honor. Just to clarify, Asaf is not treated as a bank in this complaint. What this complaint does state is that Asaf is the owner of 55.154 of the issued and outstanding shares of BBAC and that Sheikh Ghassan Asaf is the chairman and general manager of both Asaf and BBAC, facts that are not contested. Asaf is not a bank. It's an entity who happens to be an insider and majority shareholder of the bank, which gets us back to the point. All right. But you're bringing a fraudulent conveyance claim, fraudulent conveyance to Asaf, right? In dollars, and that means that there is personal jurisdiction because it's in dollars, and dollar-denominated transactions have to take place in a New York bank, right? Yes, and there's no contest that these banks don't have BBAC bank accounts here with USD in them here in New York. I think the court gets the argument. But I guess I'm just trying to understand this. So your view is that any time there's a fraudulent conveyance in dollars, any fraudulent conveyance abroad that is managed in dollars gives this court personal jurisdiction over that dispute. I believe that's fair. It sounds kind of broad, but yes. What's your best case for that? Well, the best case for that is- Well, I mean, you're asserting New York long-arm jurisdiction. So I guess I'm trying to understand whether anybody has ever agreed with you before on this, because it seems like Dow sure as heck doesn't.  And so you've sort of cleverly then said, oh, well, I'm going to bring a fraudulent conveyance plan. Okay, that is different than Dow. Yeah. What's your best case for this theory? For this theory is that my client gets to claw back his $4 million and get a check in USD because they- But the claim asserted must arise from the activity that is the cause of action, right? Yes. The activity is the bank's use of the finite U.S. dollars that it has to pay for or to give other preferential transfers. But the only complaint that you sort of conclusively state that that's what they're doing, but you don't even point to specific transactions, right? We have in the financial reports that are disclosed, there are certain allegations about the number of loans that are given to insiders and other interested parties from BBAC. But yes, we don't have an inside opening of the books to find the specific transactions where Dr. Massali makes his claim for the money. And then a week later, Mr. Ehsan Ghassaf funnels out $5 million to buy some real property somewhere in Massachusetts. We don't have that. Yeah. I think you're kind of saying that your allegations about corresponding bank account activity, corresponding bank account activity to Ehsan don't make sense. It's just as a factual matter, it doesn't make sense. And so what do we do with that if you have an allegation here that the hook seems to be the dollars, as Judge Sullivan was just asking you? Is that it? Is there anything to substantiate your business activity allegation? The only proof that we have is from the public financial audited disclosures and the research from the Foundation for Defense of Democracies, which was actually relied upon by another court and given credence and weight from their research and what it was that they learned. But how did you get around to Char? I guess I'm trying to figure that out. Because that was a fraudulent conveyance claim, right? I don't believe there was a holding on fraudulent conveyance in Char. There may have been allegations. There's certainly a holding that there's no personal jurisdiction. Yes, but there's not been a determination or a bright line or black letter rule that says these fraudulent conveyance charges aren't going to carry weight. There's plenty out there that says a breach of contract where the bank failed to deliver funds to New York is not going to be. I guess maybe I'm missing something. In Char, there's a conclusion that there's not sufficient context with New York to justify jurisdiction over the dispute. I don't know if at that time the record was fully fleshed out because New York long arm statute is a single transaction statute. So if there's one fraudulent conveyance made while a bank is insolvent, then there should be a hook. But you did allege fraudulent conveyance, right? What's that? There was a fraudulent, I mean- I'd have to look at the case. It did allege a fraudulent transfer, didn't it? A lot of the cases allege fraudulent transfer, but usually the cases are dismissed because there's no contract. And therefore, there's no purposeful availment and there's no sufficient nexus between the activity or there's no minimum context for a contract claim. And that's where the distinction, I believe, lies. And Char was a minimum context case, not a statutory long arm jurisdiction case, is that right? I believe, if I recall correctly. I don't know. I'd have to read the case again. I'm sorry. All right. Well, thank you both. We will reserve decisions.